Argued October 13; reversed November 29, 1938

## MARSHALL *v.* STRAUSS ET AL.

(84 P. (2d) 502)

*Frank H. Hilton,* of Portland (Frank G. Smith and R. E. Williams, both of Portland, on the brief), for appellants.

*W. B. Shively,* of Portland (Henry Bauer, of Portland, on the brief), for respondent.

RAND, J. This is a suit to set aside a deed of conveyance of certain real property in Multnomah county, Oregon, which the complaint alleges was conveyed by Jacob Strauss, as trustee, to the defendant, Frank H.

Hilton. The property described in the complaint consists of the South ¼ of the Northwest ¼ and the Southwest ¼ of the Northeast ¼ of section 27, township 1 north, range 2 east of the Willamette Meridian.

It is alleged in the complaint that Jacob Strauss, trustee, was the owner of said property and had full power and authority to sell and convey the same for such price as he, in his sole discretion, might deem proper, that on January 27, 1937, Jacob Strauss, trustee, "acting by and through his authorized agent, Geo. N. Black, made and entered into an agreement in writing with the plaintiff acting by his authorized agent, E. M. Taylor also known as Marshall Taylor, whereby the said defendant Jacob Strauss, trustee, promised and agreed to sell and convey the above described property to the plaintiff subject to all taxes of record, for the sum of $2,219.00 cash; and plaintiff on his part agreed to purchase said property for said cash price", and "that thereafter and on or about the — day of February, 1937, the defendant Jacob Strauss, trustee, repudiated said agreement and refused to comply with the terms thereof and still acting by and through his agent, the said Geo. N. Black, entered into an agreement to sell and convey said real property to the defendant Frank H. Hilton, subject however, to any prior rights of the plaintiff for the purchase of said property, and has agreed to convey or has conveyed said property to the defendant, Frank H. Hilton."

Then, in substance, the complaint alleges that the plaintiff has offered to perform and is now ready, able and willing to perform all the obligations of the agreement upon his part, including full payment of said purchase price, and that, at the time defendant Frank H. Hilton entered into said agreement for the purchase

of said property, he had full knowledge of the prior agreement of the plaintiff and the defendant, Jacob Strauss, trustee, and that the sale of the property to the defendant Hilton was subject to the prior rights of the plaintiff to purchase said property.

The defendants, Ward C. Smith and Frank H. Hilton, jointly answered the complaint, denying all the allegations thereof and merely alleging that the property had been conveyed by Jacob Strauss, trustee, to the defendant, Ward C. Smith.

The trustee, Jacob Strauss, also filed an answer making the same general denials and also alleging that on April 9, 1937, he had sold the property described in the amended complaint to Ward C. Smith and that "he refused to accept an offer to purchase said property made by the plaintiff about the time of the sale to said Ward C. Smith".

The cause was tried in the court below and a decree was entered, setting aside the deed given by the trustee to Smith and ordering the trustee to execute and deliver a deed conveying the property to the plaintiff and providing that, upon defendants' failure so to do, the decree stand in lieu of such deed. From this decree, the defendants have appealed.

It appears from the evidence that the property which is the subject of this litigation, at the time of her death, belonged to Cecelia Lewis, who died testate in Multnomah county, Oregon, on March 2, 1924; that this and other property was given to her by the will of her deceased husband, Leon Lewis, who died on September 7, 1908; that, under the terms of his will, she had power to dispose of it during her lifetime but had not done so, and there was a provision in his will to the effect that all of his property not disposed of by

her and remaining at the time of her death should pass one-half to his heirs and the remaining one-half to her heirs unless otherwise disposed of by her will. There were a large number of heirs of both of said parties, living at the time of her death and, with the exception of one or two thereof, they were all non-residents of the state.

After the will of Cecelia Lewis had been duly admitted to probate in the circuit court for Multnomah county, probate department, and the final account of the executors, under her will, had been filed in said court, a petition purporting to have been signed by all the parties who had or claimed to have an interest under either of said wills was filed in said court, praying that the final account be approved and that all the remaining assets of the estate of Cecelia Lewis be turned over by the executors to Jacob Strauss, trustee, "under such terms as the court may direct, for the purpose of handling the residue of said estate as set forth in the final report for our benefit individually in accordance with the amounts which are and may become to us under the bequests of said wills."

The petition also prayed that these respective amounts to which the petitioners should be entitled be determined by the court and specified in its order that the administration of her estate be closed "and that the receipt of the assets by said Jacob Strauss, as trustee, is and shall be our individual receipts for all our interest in said estate as of the date of said receipt"; that he should serve as trustee without compensation and that the property "will be converted into money by the trustee, and distributed as soon as practicable". The stipulation also recited that "It is further agreed that of the residue to be turned over to

Jacob Strauss, as trustee, one-half is held for the legatees and devisees under the Cecelia Lewis will, and that the other half for devisees of Leon Lewis''.

Pursuant to said petition, an order was made and entered in said court directing the executors to turn over all of said assets remaining on hand of the estate of Cecelia Lewis to Jacob Strauss, as trustee, upon his executing and delivering to them a receipt for said property, and Strauss was directed to convert said property into money as soon as practicable and, after the payment of taxes and necessary expenses, to divide the same into two equal parts and to distribute one part to the heirs of Leon H. Lewis and one part to the legatees under the will of Cecelia Lewis in the ratio of their respective legacies under the terms of the Cecelia Lewis will, and that, upon the filing of his receipt, the executors be discharged and their bondsmen be exonerated. The receipt was in writing and was duly filed and the executors were thereupon discharged.

It further appears from the evidence that, since the transfer by the executors of the land to Strauss as trustee, he has been endeavoring to sell the property but has been unable to find a purchaser at a price deemed reasonable by him. In the meantime the taxes on the land have accumulated and, at the time of the transfer by the trustee to Smith, amounted to about $2,500. Smith bought the property subject to the unpaid taxes and paid to the trustee the sum of $2,219.

Regardless of what implications may be drawn from the petition and order of the court, the whole evidence seems to show that Strauss, before executing the power of sale, always deemed it necessary to obtain the consent of all the beneficiaries named in the two wills before making any transfer of the trust property.

There was some evidence tending to show that Lawrence Strauss, the son of Jacob Strauss, visited Portland with his wife Sallie some time during the year 1936 and, in a conversation with Black, stated their desire that a purchaser for this property be found and later they wrote him that the property could be sold for $2,000 net to the beneficiaries, his commission and the taxes to be assumed by the purchaser. But there is no evidence tending to show that they, or either of them, had any authority to bind the trustee. It is true that the evidence does show that, some eight or ten years before that time, Jacob Strauss had given a power of attorney to his son Lawrence, but the evidence shows that it had never been acknowledged by Jacob Strauss and there is nothing in this record to show to what it referred. It was not introduced in evidence nor was any proof made of its contents.

It appears that, because of his failing eyesight, Jacob Strauss is incapable of attending to any correspondence and that his daughter-in-law, Sallie Strauss, took upon herself, without any authority from Jacob Strauss being shown, to correspond with Black concerning the sale of this property, but she herself testified that none of these letters were dictated by Jacob Strauss or written in his presence, and that she had written the letters to Black without consulting Jacob Strauss as to their contents. From this correspondence, it is plain that Sallie Strauss had no authority to bind her father-in-law by any contract which she might enter into with Black. Again, she repeatedly said in her letters to Black that, before the property could be sold so as to net the beneficiaries $2,000, it would be necessary to get their written consent to the making of such sale and that because they were living

in so many different places that could not be done. The first of her letters offered in evidence is dated November 27, 1936, and is Plaintiff's Exhibit 3. In that letter she said:

"Please do nothing further until we have full authority from all heirs to make the transaction. I have in myself no authority whatsoever but act only as correspondent for a scattered lot of heirs."

Later Black sent her a form of agreement to be signed by the heirs and on December 18th she acknowledged its receipt and stated:

"I am collecting signatures as speedily as possible on the agreement to sell which you sent me."

On December 29th, Lawrence Strauss wrote Black as follows:

"I returned on Thursday from southern California and my wife told me of the developments concerning the property. I have still two signatures to obtain, both heirs having been written to in different parts of the state, but I am sure there will be no difficulty in obtaining their consent".

On January 6, 1937, Sallie Strauss wrote to Black:

"Our best efforts have been unavailing in the matter of getting all the signatures of heirs on the contract to sell at $2,000 net, within the specified time. We have therefore decided to let the whole thing drop and await a later opportunity to sell with the hope of getting a better price."

Again, on January 12th she wrote Black:

"I do not wonder that you were distressed by our apparent change of heart. This is what happened and you will see why our hands were tied. Two of the heirs who have only a trifling share—the smallest—in the estate immediately offered to buy the property for $2,000 net as soon as they heard we were disposing of it at that price."

On January 25th, she returned the contract which Black had sent her, Plaintiff's Exhibit 13. It reads as follows:

"San Francisco, Calif.
December 14, 1936.

"Mr. Geo. N. Black, Realtor,
Portland, Oregon.

Dear Sir:

The undersigned, being all of the parties in ownership, of a certain 80 acres of land in Portland, Oregon, known as Tax lot No. 52 in Section 27, 1N 2E, hereby grant to you until the close of business of December 31st, 1936, the option to purchase said property subject to payment by him of all unpaid taxes of record, and no commission to be chargeable to us out of said $2000 net proceeds."

This writing purports to have been signed "Jacob Strauss by Lawrence Strauss" and by twelve other persons, some of whose signatures had been obtained prior to December 31, 1936, on which date the writing, by its own terms, expired. There was no witness called nor was any evidence offered to show by whom these signatures were made, nor that they were the signatures of all the parties in ownership, nor that Lawrence Strauss had any authority to sign his father's name to the writing, and obviously some of these signatures were obtained prior to December 31, 1936, and some of them later, as shown by the correspondence.

In his deposition, Jacob Strauss, the trustee, stated that he had no knowledge of any offer being made to Black; that he had never authorized one to be made, and that he had never given authority to Black to enter into any contract whatever in behalf of the trustee. On February 12, 1937, Sallie Strauss wrote Black, informing him that Jacob Strauss had told Mr. Hilton

that Hilton could have the first chance of buying this property. Presumably, having given his word to Hilton, Strauss would not break it by authorizing Black to sell it to any one else. On February 25th, Morris, Jaffa and Sumski, Jacob Strauss' attorneys, wired Black as follows:

"Cannot permit our client to close any deal for tax lot number Fifty Two property except through attorney Frank H. Hilton. We have seen original deeds from all the heirs running to Nelson conveying the entire property recorded in January nineteen twenty seven. You will therefore have to return the Marshall deposit as your authorization expired last year and was not signed by Jacob Strauss the trustee himself nor by all the heirs."

■ From this, it is manifest that Black had no authority to enter into any contract for Jacob Strauss, as trustee, looking toward the sale of this property and, if it should be assumed that some authority had been conferred upon Black by the purported agreement of December 14, 1936 (Plaintiff's Exhibit 13), the only authority conferred was to give Black an option to purchase the property for $2,000 cash net. This is far short of authorizing Black to contract with a third person in the name of Jacob Strauss, trustee, for the sale of this property. Black never exercised the option, never assigned his rights under the option to Marshall, or to any one else, and, hence, if the writing was valid and constituted a new offer upon the part of the heirs after it had been terminated by the time limit in it, this suit is not based upon said writing or any rights acquired thereunder. The most that can be claimed from the correspondence between Black and the Strausses, is that if Black had any authority at all it was the authority merely to find a purchaser.

The statute, section 9-909, Oregon Code 1930, provides:

"In the following cases the agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents, in the cases prescribed by law:  *  *  *

6. An agreement for the leasing for a longer period than one year, or for the sale of real property, or of any interest therein;

7. An agreement concerning real property made by an agent of the party sought to be charged unless the authority of the agent be in writing."

■ This case comes within the operation of that statute and, since the statute has not been complied with, the decree of the lower court must be reversed. In *Chick v. Bridges,* 56 Or. 1 (107 P. 478, Ann. Cas. 1912 B, 1295), this court said:

" 'Where a writing is required, the authority to sell must be clear and explicit, and of such a character that a fair and candid person can see without hesitation that the authority is given. There is an important distinction between an authority to find a purchaser and an authority to execute a contract of sale, which is constantly recognized and applied by the courts, and specific performance has often been refused where the transaction disclosed that the agent's powers were limited to the mere finding of a purchaser.' Warvelle, Vend. (2 ed.) § 203. The rule prevails in some states that, unless the statute of frauds expressly requires the authority of an agent to sign a contract stipulating for the sale of real property to be evidenced by a writing, his power to bind his principal by a memorandum may be created by parol. Brandon v. Pritchett, 126 Ga. 286 (55 S. E. 241: 7 Am. & Eng. Ann. Cas. 1093,

1102, and notes). In Grant v. Ede, 85 Cal. 418 (24 Pac. 890: 20 Am. St. Rep. 237) the owner of land wrote to a person that 'we will sell' the premises within a given time for a stated consideration and pay a commission. Based on the letter, the person receiving it executed a memorandum of sale, and it was held that the authority conferred was insufficient for that purpose. To the same effect is the case of O'Shea v. Rice, 49 Neb. 893 (69 N. W. 308). The writing demanded by our statute of frauds (Section 797, subd. 7, B. & C. Comp.) which will warrant an agent to bind his principal by a memorandum stipulating for the sale of real property, though not required to be sealed, witnessed, or acknowledged, must, in specifying the authority delegated, be more in the nature of a power of attorney, the terms of which should be strictly construed. Gilbert v. How, 45 Minn. 121 (47 N. W. 643: 22 Am. St. Rep. 724).''

For the reasons stated, the decree of the lower court is reversed and the cause will be remanded with directions to dismiss the suit.

BELT, BAILEY and LUSK, JJ., concur.